# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF LOUISIANA
### LAFAYETTE DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **CHC-CLP OPERATOR** | § | |
| **HOLDING, LLC** | § | **CASE NO. 14-51104** |
| | § | **CHAPTER 11** |
| DEBTOR. | § | (Joint Administration Requested) |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **CHC-SPC OPERATOR, INC.** | § | **CASE NO. 14-51106** |
| | § | **CHAPTER 11** |
| DEBTOR. | § | (Joint Administration Requested) |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **SA-LAKELAND, LLC** | § | **CASE NO. 14 - 51103** |
| | § | **CHAPTER 11** |
| DEBTOR. | § | (Joint Administration Requested) |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **SA-CLEWISTON, LLC** | § | **CASE NO. 14-51102** |
| | § | **CHAPTER 11** |
| DEBTOR. | § | (Joint Administration Requested) |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **SA-ST. PETERSBURG, LLC** | § | **CASE NO. 14-51101** |
| | § | **CHAPTER 11** |
| DEBTOR. | § | (Joint Administration Requested) |

**PALM TERRACE DEBTORS' MOTION (I) FOR INTERIM AND FINAL ORDERS (A) AUTHORIZING AND APPROVING DEBTOR-IN-POSSESSION FINANCING; (B) GRANTING SECURITY INTERESTS AND SUPERPRIORITY CLAIMS PURSUANT TO SECTIONS 364(c) and (d) AND 507 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 4001(c); AND (D) MODIFYING THE AUTOMATIC STAY; AND (II) SCHEDULING A FINAL HEARING PURSUANT TO BANKRUPTCY RULE 4001**

CHC-CLP Operator Holding, LLC, CHC-SPC Operator, Inc., SA-Lakeland, LLC, SA-Clewiston, LLC and SA-St. Petersburg, LLC (each, a "Debtor" and collectively, the "Palm Terrace Debtors"), as debtors and debtors-in-possession, file this motion (the "Motion"), and in support thereof, state as follows:

## I.
## JURISDICTION

1.      This Court has jurisdiction to consider this motion (the "Motion") pursuant to 28 U.S.C. §§ 157 and 1334.   This matter is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.
## BACKGROUND

2.      On September 3-4, 2014 (the "Petition Date"), the Palm Terrace Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.   Also on or prior to the Petition Date, certain affiliates of the Palm Terrace Debtors (collectively with Palm Terrace Debtors, the "Debtors") filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

3.      A motion seeking the joint administration of the Palm Terrace Debtors' Chapter 11 cases with those of the other Debtors is being filed concurrently with this Motion.

4.      Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, each of the Palm Terrace Debtors continues to operate its business and manage its properties, affairs and assets as

a debtor-in-possession.

<h2 style="text-align:center">III.<br/>THE DEBTOR'S BUSINESS</h2>

5. The Palm Terrace Debtors operate skilled nursing facilities located in Lakeland, Clewiston and St. Petersburg, Florida (the "Facilities"). A more detailed description of the Palm Terrace Debtors' businesses, as well as the events leading to the commencement of the Palm Terrace Debtors' Chapter 11 cases, is set forth in the Declaration of James A. Blalock, III (the "First Day Declaration") filed concurrently with this Motion, and is incorporated herein by reference.

<h2 style="text-align:center">IV.<br/>RELIEF REQUESTED</h2>

6. The Palm Terrace Debtors have an urgent and immediate need for cash to continue to operate. Currently, the Palm Terrace Debtors do not have sufficient funds with which to operate their business on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on this motion (the "Motion"), the Palm Terrace Debtors will be immediately and irreparably harmed. The availability of interim loans under the DIP Facility (as defined below) in conjunction with the continued use of cash collateral being sought by a separate motion being filed contemporaneously with this Motion will provide necessary assurance to the Palm Terrace Debtors' vendors, employees, and the residents of their Facilities, of the Palm Terrace Debtors' ability to meet their near-term obligations, including making payroll scheduled for September 9, 2014, as contemplated by the Interim Budget (as defined below). Failure to meet these obligations and to provide these assurances would have both a short-term and a long-term negative impact on the value of the Palm Terrace Debtors' business, to the detriment of all parties in interest. In short, the Palm Terrace Debtors would be forced to cease operations and

residents at the Facilities would suffer immediate harm.

7.     By this Motion, the Palm Terrace Debtors request entry of interim and final orders (the "DIP Orders") granting (i) authorization to obtain postpetition financing pursuant to sections 105, 362, 364(c)(1), 364(c)(2), 364(c)(3), 364(d), and 507 of the Bankruptcy Code, and (ii) related relief, including a modification of the automatic stay and the Palm Terrace Debtors repayment, upon entry of a final order, of certain prepetition secured indebtedness of the Palm Terrace Debtors (collectively, the "DIP Financing").

8.     In summary, the Palm Terrace Debtors request that the Court authorize the Borrowers (as defined below) to obtain senior secured, postpetition financing up to an aggregate principal amount of up to $3,000,000 (the "DIP Facility"), from SA Mezz Holdings LLC, (the "DIP Lender"), pursuant to the terms of the DIP Orders (as defined below) and that certain Term Sheet for Debtor-in-Possession Financing (the "DIP Term Sheet") substantially in the form attached hereto as **Exhibit A.**[1]

9.     Furthermore, on an interim basis, the amounts to be advanced under the DIP Facility will be limited to those necessary expenses, reflected on the Interim Budget attached as **Exhibit C** hereto, in an amount not to exceed $600,000 ("Interim Borrowing Advances") needed to fund the Palm Terrace Debtors' operations through the final hearing on the DIP Facility (the "Final Hearing"). A copy of the proposed interim order (the "Interim DIP Order") with respect to the DIP Loan Agreement is attached hereto as **Exhibit B**.

10.     More specifically, pending the entry of the final DIP order (the "Final DIP Order" and, together with the Interim DIP Order, the "DIP Orders"), the Palm Terrace Debtors request that the Court authorize the Palm Terrace Debtors, on an interim basis, (i) to borrow up to

---

[1] The Palm Terrace Debtors and the DIP Lender are working on the form of the Loan Agreement, which will be filed with the Court as soon as possible (as may be amended, supplemented, restated, or otherwise modified from time to time, the "DIP Loan Agreement" and the security and other documents to be executed in connection

$600,000 under the DIP Facility, (ii) to grant to the DIP Lender the liens and superpriority claims described in the Interim DIP Order, (iii) approve the adequacy of the proposed service thereof and (iv) schedule the Final Hearing.

## The Palm Terrace Debtors' Proposed DIP Facility

**A.     Prepetition Secured Indebtedness and Need for Post-Petition Financing**

11.     The Palm Terrace Debtors are indebted to Pacific West Bank, successor by merger to CapitalSource Bank ("PacWest"), under the terms of a Revolving Credit and Security Agreement, dated November 25, 2008 (as amended, the "Credit Agreement"). The amounts owed under the Credit Agreement are secured by liens (the "Prepetition Senior Liens") on all or substantially all of the Palm Terrace Debtors' assets, including the following: (i) Accounts; (ii) Documents; (iii) Chattel Paper; (iv) Commercial Tort Claims; (v) Deposit Accounts; (vi) General Intangibles (including Payment Intangibles and Software); (vii) Goods (including Equipment, Inventory and all accessions and attachments thereto); (viii) Instruments; (ix) Investment Property; (x) Letter-of-Credit Rights; (xi) Supporting Obligations; (xii) money, rights to the payment of money, and insurance claims related to Accounts and proceeds; and (xiii) all proceeds and products of the foregoing (collectively, the "Collateral").

12.     Prior to the Petition Date, PacWest made loans and advances to the Palm Terrace Debtors in a maximum principal amount of up to $3 million, pursuant to the terms and conditions set forth in the Credit Agreement. The amounts borrowed under the Credit Agreement were used to fund general working capital requirements of the Palm Terrace Debtors. Beginning in 2009 and continuing at various times thereafter, certain Events of Default (as defined in the Credit Agreement) occurred, and the parties entered into various amendments to the Credit Agreement. As a result of the Events of Default, the amounts outstanding under the

therewith (collectively, with the DIP Loan Agreement, the "DIP Facility Documents").

Credit Agreement are accruing interest at the default rate.

13. Pursuant to the terms of a Security Agreement, dated November 28, 2012, between certain of the Palm Terrace Debtors and The PrivateBank and Trust Company ("PrivateBank"), certain of the Palm Terrace Debtors have granted PrivateBank a security interest in all Accounts, all applicable books and records relating to the Accounts, and all proceeds of the foregoing. Pursuant to that certain Intercreditor and Subordination Agreement dated as of November 28, 2012, between PacWest and PrivateBank, PrivateBank subordinated all of the obligations and liabilities of and all liens granted by such debtors to PrivateBank (the "Prepetition Junior Liens"), to the Prepetition Senior Liens and the payment in full of all indebtedness to PacWest.

14. As described in the First Day Declaration, prior to the Petition Date, the Palm Terrace Debtors contacted several sources of potential funding for the Palm Terrace Debtors in their bankruptcy cases. First, the Palm Terrace Debtors advised PacWest of the Palm Terrace Debtors' intention to file voluntary petitions for relief under Chapter 11 of the Bankruptcy Code, and requested that PacWest consent to the use of cash collateral and fund the Palm Terrace Debtors post-petition under the Credit Agreement. PacWest advised the Palm Terrace Debtors that it did not want to serve as a post-petition lender to the Palm Terrace Debtors, and requested that the Palm Terrace Debtors find an alternate lender that would "take out" PacWest and pay off any amounts due to PacWest under the Credit Agreement. Similarly, PacWest further advised the Palm Terrace Debtors that it did not wish to authorize the use of cash collateral for the duration of the Palm Terrace Debtors' bankruptcy cases, but instead wanted to be paid in full.

15. The Palm Terrace Debtors also contacted Congressional Bank, which already had some familiarity with their assets, as well as certain related parties to the Palm Terrace Debtors. None were willing to provide financing in the form of unsecured credit allowable under section

503(b)(1), as an administrative expense under section 364(a) or (b) of the Bankruptcy Code, or solely in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1) of the Bankruptcy Code.

16.     Congressional Bank was willing to consider providing post-petition financing that provided for a refinancing of the obligations to PacWest under the Credit Agreement.   However, the Palm Terrace Debtors were advised that such financing would require the payment of fees and a higher interest rate than currently charged under the Credit Agreement, as well as the typical super-priority liens and claims sought by third-party DIP lenders.   Consequently, this potential source of financing would be costly to the Palm Terrace Debtors and their estates.

17.     The Palm Terrace Debtors quickly realized that all potential third-party outside sources of debtor-in-possession financing would be more expensive and less favorable than the terms under the Credit Agreement.   Moreover, third-party lenders would require time to conduct due diligence and make a credit decision, during which time the Palm Terrace Debtors would not be able to fund their operations.   Given the foregoing, it became clear that the most likely source of post-petition funding under these circumstances would be an entity with an existing economic interest in the Palm Terrace Debtors (or a related party).

18.     The DIP Lender is SA Mezz Holdings LLC. Harris Schwartzberg owns all of the outstanding membership interests in the DIP Lender. Mr. Schwartzberg also owns an indirect minority equity interest in the Palm Terrace Debtors and is a beneficiary and/or non-controlling trustee of certain trusts that have an indirect equity interest in the Palm Terrace Debtors.

19.     Ultimately, the Palm Terrace Debtors concluded that the DIP Facility with the DIP Lender is the best financing option available to the Palm Terrace Debtors because, among other things, the DIP Facility permits the Palm Terrace Debtors to secure the postpetition financing required for their operating expenses and other ongoing working capital requirements,

under the best terms available (and better than under the prepetition Credit Agreement), and will enable the Palm Terrace Debtors to preserve the going concern value of their business and maximize the value of their estates for all stakeholders.

20.     The Palm Terrace Debtors presently have limited cash in their bank accounts and, even with the use of cash collateral,[2] do not have sufficient funds to meet their near-term obligations for payroll and other critical expenses.   The Palm Terrace Debtors urgently require the DIP Facility to sustain their operations and continue to provide quality patient care to their residents.   Payroll and related expenses must be funded by Monday, September 8, 2014, and without approval of the use of cash collateral and the authority to immediately borrow up to $600,000 on an interim basis under the DIP Facility, the Debtors will be unable to pay their employees.

## B.     The DIP Facility

21.     The Palm Terrace Debtors and the DIP Lender engaged in arm's length negotiations with respect to the terms and conditions of the proposed DIP Facility, with the Palm Terrace Debtors on the one hand, and the DIP Lender on the other hand, represented by separate counsel.   These negotiations culminated in agreement upon the DIP Facility, including the form of Interim DIP Order and DIP Term Sheet.

22.     The significant elements of the DIP Facility are as follows:[3]

   (a)     <u>Borrower</u>.   CHC-CLP Operator Holding, LLC, CHC-SPC Operator, Inc., SA-Lakeland, LLC, SA-Clewiston, LLC and SA-St. Petersburg, LLC (collectively, the "<u>Borrowers</u>").

   (b)     <u>DIP Lender:</u>   SA Mezz Holdings LLC or its designee.

   (c)     <u>Commitment:</u>   A debtor-in-possession facility existing of a credit facility

---

[2] The Palm Terrace Debtors are filing a separate motion seeking authority to use cash collateral.
[3] This summary is qualified in its entirety by reference to the provisions of the DIP Term Sheet and the DIP Facility Documents.   Capitalized terms in this summary not otherwise defined herein shall have the meanings ascribed to such terms in the DIP Term Sheet.

up to $3,000,000.   On an interim basis, the DIP Lender shall advance an aggregate amount not to exceed $600,000. Upon entry of the Final Order, the DIP shall advance an aggregate amount not to exceed $2,400,000 (the "Final Borrowing Advance"). Interest Rate:   Fixed rate of 4.5%

(d)     Default Interest:   Two percent (2.00%) above the interest rate otherwise applicable.

(e)     Use of Proceeds.   The interim draws shall supplement the Palm Terrace Debtors' use of cash collateral and solely be used to pay payroll and related expenses, make critical vendor payments, fund working capital requirements and fund deposits to utilities.   The final draws shall be used to supplement the Palm Terrace Debtors' use of cash collateral and solely be used to pay payroll and related expenses, make critical vendor payments, fund working capital requirements and fund deposits to utilities, and to pay in full all obligations due to PacWest under the Credit Agreement.

(f)     Liens:   Except as otherwise provided in the Interim DIP Order and the Cash Collateral Order,[4] all obligations under the DIP Facility shall be secured as follows:

(i)      Interim Borrowing Advances

To secure the DIP Obligations of the Debtors for the Interim Borrowing Advances, Lender will receive a fully perfected security interest ("Interim Borrowing Lien") in all prepetition and post-petition assets of all Debtors, whether now owned or hereafter acquired   including (i) Accounts; (ii) Documents; (iii) Chattel Paper; (iv) Commercial Tort Claims; (v) Deposit Accounts; (vi) General Intangibles (including Payment Intangibles and Software); (vii) Goods (including Equipment, Inventory and all accessions and attachments thereto); (viii) Instruments; (ix) Investment Property; (x) Letter-of-Credit Rights; (xi) Supporting Obligations; (xii) money, rights to the payment of money, and insurance claims related to Accounts and proceeds; (xiii) any other tangible or intangible property pledged to PacWest under the PacWest Agreement; and (xiv) all proceeds and products of the foregoing (collectively, the "Collateral"), and all rights, claims, and other causes of action of such Debtors' estates (including any actions asserted by any Debtor or any subsequently appointed trustees or representatives of that Debtor's estate under any section of the Bankruptcy Code), and in each case, all proceeds resulting therefrom, except that avoidance actions under sections 544, 545, 547, 548 , 550, 551, or 553 of the Bankruptcy Code are excluded.

---

[4] Until such time as PacWest is paid in full, the DIP Lenders liens and claims shall be subordinate to any of PacWest's valid, perfected, prepetition liens and the adequate protection liens granted to PacWest under the Cash Collateral Order.

"Collateral" shall also include any and all rents, issues, products, offspring and profits generated by any item of Collateral, without the necessity of any further action of any kind or nature by Lender in order to claim or perfect such rents, issues, products, offspring and/or profits.

The Interim Borrowing Lien shall (A) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on the Collateral that is not otherwise subject to any lien, subject only to the Carve-Out; (B) pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on the Collateral presently subject to valid, unavoidable and enforceable pre-petition security interests granted in the Collateral (excluding the prepetition junior liens ("Prepetition Junior Liens") of PrivateBank and Trust Company), subject only to the Carve-Out; and (C) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected senior lien on Collateral presently subject to the Prepetition Junior Liens.

(ii)     Final Borrowing Advances

Upon entry of the Final Order, the Interim Borrowing Advances and the Final Borrowing Advances, shall (A) pursuant to Section 364(c)(2) of the Bankruptcy Code, be secured by a perfected first priority lien on the Collateral that is not otherwise subject to any lien, subject only to the Carve-Out; (B) pursuant to Section 364(c)(3) of the Bankruptcy Code, be secured by a perfected junior lien on the Collateral presently subject to valid, unavoidable and enforceable pre-petition security interests granted in the Collateral (excluding the Prepetition Junior Liens), subject only to the Carve-Out; and (C) pursuant to Section 364(d)(1) of the Bankruptcy Code, be secured by a perfected senior lien on Collateral presently subject to the Prepetition Junior Liens ("Final Borrowing Lien") in the Collateral, and all rights, claims, and other causes of action of such Debtors' estates (including any actions asserted by any Debtor or any subsequently appointed trustees or representatives of that Debtor's estate under any section of the Bankruptcy Code), and in each case, all proceeds resulting therefrom, excluding avoidance actions under sections 544, 545, 547, 548, 550, 551, or 553 of the Bankruptcy Code.

(g)     Superpriority Claims:     In addition to the Interim Borrowing Liens and Final Borrowing Liens granted pursuant to section 364(c)(2), section 364(c)(3), and section 364(d)(1) of the Bankruptcy Code, the Lender shall also receive and be entitled, pursuant to Section 364(c)(1) of the Bankruptcy Code, to a super-priority administrative expense claim in the amount of all DIP Obligations (the "Superpriority Claim") with priority over all other costs and expenses of the kinds specified in, or ordered pursuant to, sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726, 1114 or any other provisions of the Bankruptcy Code, subject only to

the Carve Out (defined below) and, prior to the entry of the Final Order, any superpriority administrative claims in favor of PacWest (to the extent allowed by the Bankruptcy Court) solely as adequate protection for the Debtors' use of cash collateral of PacWest. The Superpriority Claims to be granted to the Lender under the DIP Loan Documents and the DIP Facility Orders may not be the basis to avoid or recover any payments made pursuant to the then applicable DIP Budget (and the 10% variance) in the ordinary course of business.

Upon an Event of Default (or an event for which notice of default has been given and which with the lapse of time would constitute an Event of Default), the Lender's liens on the Collateral and the Lender's administrative claims provided for herein shall be subject to a carve out (the "Carve Out") in an amount not to exceed (i) fees pursuant to 28 U.S.C. § 1930 and any fees payable to the clerk of the Bankruptcy Court that are due upon the occurrence of an Event of Default; (ii). fees and expenses due to professionals employed by the Borrowers, for services rendered as Debtors and/or Chapter 11 debtors in possession that are due upon the occurrence of an Event of Default in an amount not to exceed $100,000.00; and (iii) fees and expenses to professionals employed by the Committee for services rendered while the Debtors are Chapter 11 debtors in possession that are due upon the occurrence of an Event of Default in an amount not to exceed $25,000.00.

(h)   Mandatory Repayments:   Mandatory prepayment provisions usual and customary for transactions of this type, including 100% of the net proceeds of any sale or other disposition (including as a result of casualty or condemnation) of any collateral.

(i)   Fees and Expenses:   The lender is charging no origination fee in connection with the DIP Facility. However, the Borrowers shall pay reasonable legal fees and expenses of Lender incurred in connection with the DIP Facility and the Chapter 11 Cases. On or before the 15th day of each month following the month for which compensation is sought, any professionals for the Lender will submit redacted invoices to the following: (1) the Debtors, and their respective counsel; (2) the Office of U.S. Trustee for the Western District of Louisiana, Lafayette Division; and (3) any official committees appointed through their counsel (hereinafter these parties shall be referred to as the "Service Parties"). Each such entity receiving an invoice will have five (5) days after its receipt to review the invoices. At the expiration of the five (5) day period, if no objection is made to the invoices, each professional who submitted invoices will notify the Debtors in writing that no objections have been filed with regard to the professional's fees and expenses, and the payments shall be made directly to the applicable professional. In the event any of the Service Parties have an objection to the compensation or reimbursement sought in a particular invoice and the parties are unable to reach an agreement, Lender shall file

a motion for expedited hearing

(j)      <u>Releases:</u> Usual and customary releases of the Lender and its agents and professionals for claims arising from or related to the DIP Facility.

(k)      <u>Events of Default and Remedies.</u>  Usual and customary for facilities of this nature, if not more favorable to the Borrowers, including, without limitation, the following (with a notice thereof filed in the Bankruptcy Court record):

    (i)      entry of an order dismissing any of the Chapter 11 Cases or converting any of the Chapter 11 Cases to a chapter 7 case;

    (ii)      entry of an order appointing a chapter 11 trustee in any of the Chapter 11 Cases;

    (iii)      entry of an order in any of the Chapter 11 Cases appointing an examiner with powers to take any action other than investigate and report;

    (iv)      expiration or termination of the Debtors' exclusive period to file and confirm a plan of reorganization;

    (v)      entry of an order granting any other super-priority claim or lien equal or superior to that granted to the Lender prior to full and indefeasible repayment of the DIP Facility other than as specifically authorized herein;

    (vi)      entry of an order reversing, vacating or otherwise modifying, or staying the Interim Order or Final Order approving the DIP Facility, or either such order shall otherwise cease to be in full force and effect;

    (vii)      breach of this Term Sheet, the Debtor in Possession Loan and Security Agreement (the "<u>DIP Credit Agreement</u>"), or any related guaranty, security and other agreements, documents, notes and instruments together with all exhibits, schedules, annexes and appendices thereto (collectively, with this Term Sheet and the DIP Credit Agreement, the "<u>DIP Loan Documents</u>"), provided that upon execution of the DIP Loan Documents, the Term Sheet shall no longer be a governing document, after (a)Lender's written notice of such breach to the Debtors, (b) the filing of such notice in the record of the Chapter 11 Cases and (c) the Debtors' failure to cure any such breach within five (5) business days of the  filing of such written notice in the record of the Chapter 11 Cases (the "<u>Default Notice/Cure Period</u>");

    (viii)      the filing of a motion by the Debtors for entry an order staying or otherwise prohibiting the prosecution of any Enforcement Action or any motion or pleading seeking to challenge the Lender's liens or otherwise commencing any cause of action against the Lender;

(ix) the consummation of a sale of any material portion of the Debtors' assets without the Lender's consent that does not indefeasibly pay in full in cash the DIP Obligations owed to the Lender under the DIP Facility on the effective date of such sale;

(x) the failure of any Debtor to pay interest, fees, or principal when due under the DIP Facility after the Default Notice/Cure Period;

(xi) the entry of an order (a) granting stay relief as to any material contract, lease, or obligation or against any critical vendor, (b) allowing a third party to proceed against any material assets or contracts of the Debtors, or (c) otherwise adversely affecting the Lender's liens after the Default Notice/Cure Period;

(xii) failure of any Debtor to perform or comply with any material term or covenant of the DIP Facility after the Default Notice/Cure Period;

(xiii) the filing of a plan of reorganization by the Debtors that does not propose to indefeasibly pay in full in cash on the effective date thereof all DIP Obligations owed to the Lender under the DIP Facility;

(xiv) a change in control of any Debtor;

(xv) any Debtor shall fail to comply in any material respect with the DIP Budget (after accounting for any permitted line-item and/or overall variances within 10% of the DIP Budget amount), after the Default Notice/Cure Period;

(xvi) Debtors' failure to pay any material post-petition obligation when due after the Default Notice/Cure Period;

(xvii) Debtors' failure to perform or comply with any material terms or conditions of the DIP Facility Orders or any order authorizing use of cash collateral after the Default Notice/Cure Period;

(xviii) the filing by any of the Debtors of any motion or proceeding that could reasonably be expected to result in material impairment of the Lender's rights under this Term Sheet, DIP Credit Agreement or DIP Loan Documents, including any motion to surcharge the Lender, the DIP Facility or the Collateral under 11 U.S.C. § 506(c) or otherwise after the Default Notice/Cure Period;

(xix) any material impairment of the Collateral or the termination of any of state or federal licenses and authorizations or material contracts after the Default Notice/Cure Period;

(xx) (a) Debtors' failure to maintain requisite licenses to properly operate their present businesses; (b) any of the Debtors' facilities is shut

down or ceases to operate for any reason; or (c) a party, other than the current manager of the Debtors, manages the Debtors' assets after the Default Notice/Cure Period;

(xxi)  any failure by any of the Debtors to timely deposit proceeds into lockbox account after the Default Notice/Cure Period;

(xxii)  the failure of the Debtors to have the continued use of cash collateral pursuant to the order entered on September [8], 2014 (or any subsequent order acceptable to Lender) after the Default Notice/Cure Period;

(xxiii) the occurrence of a material adverse change, including without limitation any such occurrence resulting from the entry of any order of the Bankruptcy Court, in each case as determined by Lender in its sole and absolute discretion, in (1) the condition (financial or otherwise), operations, assets, business or business prospects of the Debtors, (2) the Debtors' ability to repay the DIP Obligations, and/or (3) the value of the Collateral (each of (1), (2) and (3) constituting a "Material Adverse Change") after the Default Notice/Cure Period;

(xxiv) Borrower breaches any warranties made in any of the DIP Loan Agreement or such statement was not true when made, to the extent that such warranty relates to a specific timeframe after the Default Notice/Cure Period;

(xxv)  the failure of the Debtor duly and punctually to observe, perform, or discharge any material obligation or duty imposed upon them by the Interim DIP Order or the Final DIP Order after the Default Notice/Cure Period;

(xxvi) and other customary events of default.

Upon the occurrence of an Event of Default and the expiration of any right to cure with respect thereto as stated above, notwithstanding the applicability of Section 362 of the Bankruptcy Code, relief from automatic stay shall be deemed granted and the Lender shall be entitled to exercise any and all remedies available in law or equity (subject only to the Carve-Out) without obtaining further relief or order from the Bankruptcy Court.

(l)  Maturity Date.  Borrowings shall be repaid in full, and the DIP Facility shall terminate, on the earliest to occur (the "Maturity Date") of, among other things, (i) six months from entry of the Interim Order, (ii) the effective date of a plan of reorganization; (iii) consummation of the sale of substantially all of the assets of any of the Borrowers, (iv) the date the Bankruptcy Court orders the conversion of the bankruptcy case of the Borrowers to a Chapter 7 liquidation, or the appointment of a Chapter 11

trustee, (v) the termination of the DIP Facility in accordance with the definitive agreement in respect of the DIP Facility, (vi) occurrence of Event of Default; and (vii) other customary maturity events.

(m) <u>Representations and Warranties</u>. Usual and customary for facilities of this nature, if not more favorable to the Borrowers.

(n) <u>Negative Covenants</u>. Usual and customary for facilities of this nature, if not more favorable to the Borrowers.

(o) <u>Affirmative Covenants.</u> Usual and customary for facilities of this nature, if not more favorable to the Borrowers.

(p) <u>506(c) Surcharge Waiver.</u> The Final Order will provide that the Borrowers and their estates have no right to seek to surcharge against the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code and the Borrowers and the estate waive the "equities of the case" exception in Section 552(b) of the Bankruptcy Code.

23. The Palm Terrace Debtors and the DIP Lender have agreed upon an interim budget (the "Interim Budget"), annexed as **Exhibit C**, projecting operations through the week ending September 26, 2014. Prior to the Final Hearing, the Palm Terrace Debtors anticipate agreeing with the DIP Lender on a budget covering the next period (the "Approved Budget").

24. The Palm Terrace Debtors believe that the Interim Budget is achievable and will allow the Palm Terrace Debtors to pay necessary expenses through the Final Hearing.

## V.
## AUTHORITY

A. **The DIP Facility Should Be Authorized**

25. Approval of the DIP Facility will provide the Palm Terrace Debtors with immediate and ongoing access to borrowing availability to pay their current and ongoing operating expenses, including postpetition salaries and utility and vendor costs. Unless these expenditures are made, the Palm Terrace Debtors will be forced to cease operations, which could result in irreparable harm to its business and substantial going concern value being destroyed. The credit provided under the DIP Facility will enable the Palm Terrace Debtors to continue to

pay salaries and operate its business in the ordinary course and in an orderly and reasonable manner to preserve and enhance the value of their estates for the benefit of all parties in interest. The availability of credit under the DIP Loan Agreement will provide the Palm Terrace Debtors' vendors and suppliers the confidence that will enable and encourage them to continue their credit and/or other relationship with the Palm Terrace Debtors. Accordingly, the timely approval of the relief requested herein is imperative.

26.     Furthermore, use of the DIP Facility to pay the outstanding obligations under the Credit Agreement is both necessary and beneficial to the Palm Terrace Debtors and their estates for several reasons. First, the Palm Terrace Debtors lack the liquidity, even with the use of cash collateral, to fund their short term obligations, and PacWest has advised the Palm Terrace Debtors that it will not make any further advances under the Credit Agreement and will not consent to be "primed" by another lender. Because PacWest has a lien on all or substantially all of the Palm Terrace Debtors' assets, the Palm Terrace Debtors could not grant a senior lien to a prospective DIP Lender without either satisfying the obligations in full to PacWest or engaging in a costly priming fight with PacWest. The DIP Facility avoids these disputes and the associated expenses and provides the liquidity the Palm Terrace Debtors need to operate the Facilities. Additionally, since the Palm Terrace Debtors are in default under the Credit Agreement, interest is accruing at the default rate. The proposed DIP Facility has lower rates and fees and better terms. The longer the obligations to PacWest remain outstanding, the greater the amount of interest, fees and expenses that will be charged to the Palm Terrace Debtors' estates. Third, the post-petition refinancing of the Credit Agreement does not expand the collateral pledged under the Credit Agreement or seek additional collateral which an proposed DIP lender would ordinarily request (and excludes Avoidance Actions). Consequently, the relative priorities among creditors to the estate are largely the same as they would be if the

PacWest continued to lend under the Credit Agreement. Finally, parties in interest will have adequate time before the Final Hearing to review and investigate PacWest's liens and claims.

27.     Section 364(c) of the Bankruptcy Code provides, among other things, that if a debtor is unable to obtain unsecured credit allowable as an administrative expense under section 503(b)(1) of the Bankruptcy Code, the court may authorize the debtor to obtain credit or incur debt (a) with priority over any and all administrative expenses as specified in sections 503(b) or 507(b) of the Bankruptcy Code, (b) secured by a lien on property of the estate that is not otherwise subject to a lien, or (c) secured by a junior lien on property of the estate that is subject to a lien. 11 U.S.C. § 364. Section 364(d)(1) of the Bankruptcy Code provides that the Court may authorize a debtor to incur debt secured by a senior or equal lien on property of the estate that is subject to a lien only if (a) the debtor is unable to obtain such credit otherwise, and (b) there is adequate protection of the interest of the holder of the lien on which such senior or equal lien is to be granted. The Palm Terrace Debtors propose to obtain the financing set forth in the DIP Facility by providing, *inter alia,* superpriority claims, security interests, and liens pursuant to sections 364(c)(l), (2) and (3) and, with respect to the Junior Creditors' Liens only, 364(d)(1) of the Bankruptcy Code.

28.     The Palm Terrace Debtors' liquidity needs can be satisfied only if they are authorized to borrow funds under the DIP Facility and to use such proceeds to fund operations. The Palm Terrace Debtors have been unable to procure sufficient financing in the form of unsecured credit allowable under section 503(b)(1), as an administrative expense under section 364(a) or (b), in exchange for the grant of a superpriority administrative expense claim pursuant to section 364(c)(1). The Palm Terrace Debtors have not been able to obtain postpetition financing or other financial accommodations from any alternative prospective lender or group of lenders on more favorable terms and conditions than those for which approval is sought herein.

29.     Having determined that financing is available only under sections 364(c) and (d) of the Bankruptcy Code, the Palm Terrace Debtors negotiated with the DIP Lender at arm's length.     Provided that a debtor's business judgment does not run afoul of the provisions of, and policies underlying, the Bankruptcy Code, courts grant a debtor considerable deference in acting in accordance therewith.     *See, e.g., See, e.g, Bray v. Shenandoah Fed. Sav. & Loan Ass'n (In re Snowshoe Co.), 789* F.2d 1085, 1088 (4th Cir. 1986); *In re Ames Dep't Stores, Inc.,* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990) ("cases consistently reflect that the court's discretion under section 364 is to be utilized on grounds that permit reasonable business judgment to be exercised so long as the financing agreement does not contain terms that leverage the bankruptcy process and powers or its purpose is not so much to benefit the estate as it is to benefit parties in interest"); *see also In re Curlew Valley Assocs., 14* B.R. 506, 513-14 (Bankr. D. Utah 1981); *In re Simasko Prod. Co.,* 47 B.R. 444, 449 (D. Colo. 1985).

30.     Here, the Palm Terrace Debtors have been unable to procure the required funding absent the proposed claims and liens.     The Palm Terrace Debtors submit that the circumstances of these cases require the Palm Terrace Debtors to obtain financing under sections 364(c) and (d) of the Bankruptcy Code, and accordingly, the DIP Facility reflects the exercise of sound business judgment.     Additionally, the Palm Terrace Debtors submit that with respect to the granting of a 364(d)(1) senior lien to the Junior Creditors' Liens, PrivateBank will be adequately protected by the Palm Terrace Debtors continued post-petition rent payments under their Facilities leases, a portion of which funds are paid to PrivateBank to service the mortgage on the Facilities.[5]

31.     The terms and conditions of the DIP Facility are fair and reasonable, and were negotiated extensively by well-represented parties in good faith and at arm's length.

---

[5] The Palm Terrace Debtors are in discussions with PrivateBank regarding the relief sought in this motion and hope to have their consent in advance of the hearing.

Accordingly, the DIP Lender and all obligations incurred under the DIP Facility should be accorded the benefits of section 364(e) of the Bankruptcy Code.

**B.      The Automatic Stay Should be Modified on a Limited Basis**

32.      The DIP Facility and the relief requested herein contemplates a modification of the automatic stay (to the extent necessary), to permit the Palm Terrace Debtors to grant the security interests, liens and superpriority claims described above and to allow the Palm Terrace Debtors and the DIP Lender to perform such acts as may be necessary or desirable to perfect such interests and liens.   The DIP Facility also provides for a modification of the automatic stay in the case of an Event of Default to permit the DIP Lender to exercise its remedies. Specifically, the Interim DIP Order provides that with respect to most Events of Defaults, after the occurrence and during the continuation of any Event of Default, and after (a) DIP Lender's written notice of such breach to the Debtors, (b) the filing of such notice in the record of the Chapter 11 Cases and (c) the Debtors' failure to cure any such breach within five (5) business days of the filing of such written notice in the record of the Chapter 11 Cases, the DIP Lender shall be entitled to exercise its rights and remedies in accordance with the Interim Order and the DIP Financing Documents without further order of the Court.

33.      Stay modifications of this kind are ordinary and standard features of postpetition financing facilities, and the requirement that the DIP Lender give five (5) business days' notice before it is permitted to exercise its rights and remedies will provide the Debtor and other parties in interest the opportunity to challenge any alleged Event of Default.   Consequently, the Palm Terrace Debtors submit that the proposed modification to the automatic stay is both reasonable and fair under the circumstances, and should be approved.

**C. Interim Approval Should Be Granted To Avoid Immediate and Irreparable Harm to the Debtor's Estate**

34. Bankruptcy Rules 4001(b) and (c) provide that a final hearing on a motion to use cash collateral or obtain credit, respectively, may not be commenced earlier than fourteen (14) days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and authorize the use of cash collateral and the obtaining of credit to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

35. Pursuant to Bankruptcy Rules 4001(b) and (c), the Palm Terrace Debtors request that the Court conduct an expedited preliminary hearing on this motion and (a) authorize the Palm Terrace Debtors to borrow up to $600,000 (the Interim Borrowing Advances) under the DIP Facility on an interim basis, pending entry of a final order, in order to (i) maintain and finance the ongoing operations of the Palm Terrace Debtors, and (ii) avoid immediate and irreparable harm and prejudice to their estates and all parties in interest, and (b) schedule a hearing to consider entry of a final order.

36. As discussed above, the Palm Terrace Debtors have an urgent and immediate need for cash to continue to operate. The Palm Terrace Debtors do not have sufficient funds with which to operate its business on an ongoing basis and, specifically, to meet payroll obligations on September 9, 2014. Absent immediate authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on the motion, the Palm Terrace Debtors will be immediately and irreparably harmed and the residents at the Facilities will likewise suffer immediate and irreparable harm. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Palm Terrace Debtors' reorganization efforts.

**E.    Form and Manner of Notice of Final Hearing**

37.    The Palm Terrace Debtors propose to, no later than two (2) business days following the entry of the Interim DIP Order, file with the Court and cause to be served upon parties in interest notice of the Final Hearing with a copy of the Interim DIP Order, and apprising such parties of the date of the Final Hearing, the objection deadline, and that (i) copies of the DIP Credit Agreement will be made available upon request, and (ii) the form of Final DIP Order will be filed with the Court and made available upon request at least five (5) business days prior to the Final Hearing.

**Notice**

38.    The Palm Terrace Debtors are serving notice of this Motion on (i) the Office of the United States Trustee for the Western District of Louisiana, (ii) counsel to the DIP Lender, (iii) the holders of the twenty (20) largest unsecured claims against the Palm Terrace Debtors (on a consolidated basis), (iv) all parties having filed a notice of appearance in the above-captioned case; (v) PacWest and its counsel; (vi) PrivateBank and (vii) other junior lienholders.   In light of the nature of the relief requested, the Palm Terrace Debtors submit that no other or further notice need be provided.

WHEREFORE, the Palm Terrace Debtors respectfully request entry of an order granting the relief requested herein and such other or further relief as is just.

Dated:   September 5, 2014

Respectfully submitted,

NELIGAN FOLEY LLP

By:   */s/ Patrick J. Neligan, Jr.*
    Patrick J. Neligan, Jr.
    Texas State Bar No. 14866000
    pneligan@neliganlaw.com
    James P. Muenker
    Texas State Bar No. 24002659
    jmuenker@neliganlaw.com
325 N. St. Paul, Suite 3600
Dallas, Texas   75201
Telephone:   214-840-5300
Facsimile:   214-840-5301

PROPOSED COUNSEL FOR THE DEBTORS

**CERTIFICATE OF SERVICE**

I hereby certify that on September 5, 2014, a true and correct copy of the foregoing document was served on each of the parties on the attached list by U.S. First Class Mail, postage prepaid.

*/s/ Patrick J. Neligan, Jr.*
Patrick J. Neligan, Jr.

80600v.5

# PALM TERRACE DEBTORS SERVICE LIST

Office of the United States Trustee
300 Fannin Street, Suite 3196
Shreveport, LA 71101

Katten Muchin Rosenman LLP
Attn: Kenneth J. Ottaviano
525 West Monore Street
Chicago, IL 60661-3693

Belfor USA Group Inc.
185 Oakland Avenue, Suite 300
Birmingham, MI 48009-3443

Donnelly Engineering
8751 Commodity Circle, Suite 5
Orlando, FL 32819

Healthcare Services Group Inc.
3220 Tillman Drive, Suite 300
Bensalem, PA 19020

Joerns Healthcare Inc.
P.O. Box 933733
Atlanta, GA 31193

Long Term Care Nutrition
2308 Longmoore Court
Orlando, FL 32835

Maxwell Urethane Roofing Inc.
P.O. Box 150081
Cape Coral, FL 33915

Mobilex USA/Symphony Inc.
930 Ridgebrook Road, 3rd Floor
Sparks Glencoe, MD 21152

RK Collaborative
545 Delaney Avenue, Suite 7
Orlando, FL 32801

Trinity Non-Emergency Transport
P.O. Box 2005
Bartow, FL 33831

Vista Clinical Diagnostics Inc.
4290 South Hwy. 27, Suite 201
Clemont, FL 34711

Pacific Western Bank
5404 Wisconsin Ave., 2nd Floor
Chevy Chase, MD 20815

Bayfront Medical Center Inc.
701 6th Street South
St. Petersburg, FL 33701

Direct Supply Healthcare Equipment
P.O. Box 88201
Milwaukee, WI 53288-0201

Greenberg Traurig LLP
101 East College
P.O. Drawer 1838
Tallahassee, FL 32302

Hendry Regional Medical Center
524 W. Sagamore Avenue
Clewiston, FL 33440

Littler Mendelson, P.C.
P.O. Box 45547
San Francisco, CA 94145-0547

Maintenance Warehouse
P.O. Box 509058
San Diego, CA 92150-9058

Medline Industries
P.O. Box 382075
Pittsburg, PA 15251-8075

Omnicare Pharmacy
900 Omnicare Center
201 East Fourth Street
Cincinnati, OH 45202

Specialize Medical Services Inc.
7237 Solution Center
Chicago, IL 60677-7002

U.S. Foodservice
3682 Collection Center Drive
Chicago, IL 60693-0036

Florida Department of Revenue
5050 West Tennessee Street
Tallahassee, FL 32399-0100

80630v.1

Florida Department of Health
Div. Medical Quality Assurance
4052 Bald Cypress Avenue
Tallahassee, FL 32399-3260

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

American Express Finance
P.O. Box 1270
Newark, NJ 07101

Joseph P. Hebert
Liskow & Lewis
822 Harding Street
Lafayette, LA 70503

Polk County Tax Assessor
430 East Main Street
Bartow, FL 33830

PrivateBank and Trust Company
120 South LaSalle Street
Chicago, IL 60603

Cannon Financial Services Inc.
14904 Collection Center Drive
Chicago, IL 60693-0149

William H. Patrick III
Tristan Manthey
Cherie D. Nobles
Heller, Draper, Patrick, Horn & Dabney LLC
650 Poydras Street, Suite 2500
New Orleans, LA 70130

80630v.1